**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

TAMPA BAY RAYS BASEBALL, LTD.,

      Plaintiff,

 v.

VOLUME SERVICES, INC.,

      Defendant.

_____/

Case No.:_____

## COMPLAINT

Plaintiff, Tampa Bay Rays Baseball, Ltd. (the "Rays"),[1] sues Defendant, Volume Services, Inc. ("Centerplate"), and states:

## INTRODUCTION

1.     Before the first home game in their inaugural 1998 season as a new Major League Baseball franchise, the Rays entered into a Concession Agreement with Centerplate in which the Rays required—and Centerplate undertook the express and exclusive obligation to provide—first-class and professional concession, catering, and restaurant services consistent with a premier sports facility.

2.     The Rays granted Centerplate the long-term, exclusive right and responsibility for concessions based upon Centerplate's purported experience in providing such services and its representations that its employees and executives would devote themselves to delivering the quality of service and standard of performance that the Rays demanded.

---

[1] Effective November 8, 2007, Tampa Bay Devil Rays, Ltd. changed its name to Tampa Bay Rays Baseball, Ltd.

3.      Centerplate, however, took advantage of and ignored the Rays, surreptitiously cut corners, underreported gross receipts, concealed performance issues, underpaid the Rays, and underperformed under the Concession Agreement to the detriment of the Rays and their fans.

4.      From the outset of the relationship, the Rays went to great efforts to work with Centerplate to encourage Centerplate to deliver the quality fan experience the Rays contracted for, but Centerplate consistently failed to perform and neglected its obligations despite the Rays' repeated calls for improvement.

5.      Centerplate materially breached numerous contractual obligations and duties owed to the Rays by, among other things, failing to deliver the requisite quality of service and standard of performance required, failing to properly operate and maintain the concessions equipment and facilities, failing to keep or provide accurate records to the Rays regarding revenues and commissions owed, failing to pay the Rays its agreed-upon share of the revenues from concessions, and failing to indemnify the Rays for Centerplate's negligence.

6.      As a result of Centerplate's frequent contractual violations, its pattern of misconduct, and overall mishandling of the Stadium's concessions, the Rays have suffered significant harm.  Centerplate's inappropriate actions and glaring failures sullied the Rays' brand and reputation, shorted the Rays on considerable revenue and other sums due and owing, caused significant lost profits, and inflicted extensive out-of-pocket costs.

7.      For these reasons, the Rays seek damages from Centerplate for numerous breaches of contract, breach of an implied-in-fact contract, breach of an implied-in-law contract, breach of the implied covenant of good faith and fair dealing, bailment, and negligence.

## THE PARTIES, JURISDICTION, AND VENUE

8.      The Rays franchise is a Florida limited partnership with its principal place of business in St. Petersburg, Florida.

9.      Centerplate is a Delaware Corporation with its principal place of business in Greenville, South Carolina.  Centerplate is a wholly-owned subsidiary of Centerplate, Inc.

10.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) in that the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is diversity of citizenship between the parties.

11.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2).

## GENERAL ALLEGATIONS

12.      The Tampa Bay Rays is a Major League Baseball franchise that plays at Tropicana Field ("the Stadium") in St. Petersburg, Florida.

13.      Centerplate is a corporation in the business of providing facilities concession, catering, restaurant, and hospitality services.

14.      In March 1995, Major League Baseball expanded the number of its teams.  As a result, the Tampa Bay area welcomed a new team, the Rays, to Florida.

15.      In contemplation of the Rays' inaugural 1998 season, the Rays solicited bids during the construction phase of the Stadium for the right to be the exclusive concessionaire of the Rays.

**The Concession Agreement and Initial Amendments**

16.      Based upon their purported experience and their representations regarding their dedication to delivering the first-class standard of performance and first-quality products and services that the Rays demanded, Centerplate was awarded the sole and exclusive right to be the Rays' concessionaire.

3

17.     Centerplate and the Rays entered into a Concession Agreement on March 31, 1997 (the "Agreement"), to memorialize the parties' relationship and certain obligations.  A copy of the Agreement is attached as Exhibit A.

18.     In the Agreement, Centerplate confirmed various representations to the Rays and accepted detailed obligations regarding its responsibility for handling all aspects of concessions at any and all events held at the Stadium, regardless of whether such events were sponsored by the team.

19.     For a 20-year term, Centerplate undertook the task of constructing and equipping facilities for, purchasing, selling, pricing, serving, accounting for, and reporting all food, alcoholic and non-alcoholic beverages, tobacco, candy, souvenirs, novelties, other merchandise, scorecards, programs, yearbooks and other team publications, and catering and restaurant services.

20.     After the parties entered into the Agreement, the parties executed two written amendments in 1998 that further defined the parties' relationship and Centerplate's required performance and obligations with regard to sub-concessionaires and certain restaurants at the Stadium.

21.     A copy of the Amendment to Concession Agreement entered into on January 6, 1998, is attached as Exhibit B.

22.     A copy of the Second Amendment to Concession Agreement entered into on June 19, 1998, is attached as Exhibit C.

23.     In 2000, rather than follow a more formal amendment process, Centerplate executed and delivered to the Rays an acceptance of "Contract Terms," containing several provisions that altered the terms set forth in the Agreement, released Centerplate from a certain

contractual obligation under the Agreement, and provided that the Rays and Centerplate each assumed certain expenses.

24.     A copy of the Contract Terms executed on July 6, 2000, is attached as Exhibit D.

25.     Under the Agreement and these amendments, Centerplate received its exclusive grant as concessionaire on the condition that, among other things, Centerplate agree that, as Manager, it:

    a.  shall provide the following services in a first-class, professional, businesslike and efficient manner consistent with a premier sports facility:

       i.  retain, train, monitor, evaluate, discipline and dismiss employees with appropriate qualifications, training and experience in sufficient numbers to provide all services appropriate for concessions services, and—in so doing—be solely responsible for the employees and their actions and shall otherwise supervise and control the employees;

      ii.  purchase inventory and consumable supplies from vendors adequate for the provision of the concession services;

    iii.  prepare menus, recipes and food and drink selections and use commercially reasonable efforts to assure that there will at all times be available a full complement of the various food, drink, and service items that are for sale;

    iv.  periodically establish competitive pricing for various food, drink and service items;

      v.  provide concession services on the day of all events with the goal of maximizing concession revenues; provided, however, that no operations or alcoholic beverage sales shall take place during any hours or periods when the same may be prohibited by applicable federal, state or local liquor control laws, ordinances or regulations;

    vi.  institute such control procedures as may be reasonably necessary to assure the accurate accounting for and deposit of funds and the preservation of inventory, supplies and alcoholic beverages;

    vii.  maintain the Stadium concession facilities in normal operating condition and in accordance with all material federal, state and local safety, health and other laws, ordinances and regulations;

     viii.  assist the Rays, as owner, in its monthly, quarterly and long-range business projections as to revenues and commissions under this Agreement;

     ix.  maintain and prepare the following accounting and financial records, and shall make these records available for inspection by the Rays: (a) Event cash receipts report; (b) Monthly revenue statements with year-to-date revenues; (c) Monthly revenue projections and thereafter monthly reports noting and explaining deviations therefrom; (d) Required tax and accounting records with respect to employees, sales tax, income tax or otherwise required by law or generally necessary, required or helpful, for similarly situated businesses including without limitation payroll taxes, W-2 forms, general ledgers and sales tax reports;

b.  shall purchase, design, construct, furnish, equip, and install at its sole cost and expense (without regard to any budgetary ceilings or limitations), all improvements to the various concession facilities to be located within the Stadium and amortize its entire investment in all such improvements to the concession facilities and restaurants on a straight-line basis over the period of 20-years;

c.  shall be responsible for bringing trash and rubbish from the concession areas to the disposal facilities reasonably designated by the Rays and bear expenses for trash pickup after any non-MLB event;

d.  shall not advertise in any manner or form in or about the Stadium except as may be approved by the Rays;

e.  shall deliver a quality of service and standard of performance pursuant to which it:

     i.  shall serve only first class and first-quality products offering brand choice, and an assortment of menu and food items;

     ii.  shall conform in all respects to all material federal, state and local laws, ordinances and regulations with respect to its products and methods of service;

     iii.  shall perform its services and offer products at least comparable to those of other first-class similarly situated sports facilities across the country;

     iv.  shall devote any such time of its employees and its executives as may from time to time be necessary to perform its obligations under this Agreement in accordance with this standard of performance;

f.  shall maintain all Stadium concession facilities, furniture, fixtures and equipment in first-class operating and sanitary condition and so as to comply with all material federal, state and local laws, ordinances and regulations;

g.  shall subject the Stadium concession facilities, furniture, fixtures and equipment to periodic sterilization and such other procedures as may be required by all material federal, state and local laws, ordinances and regulations or as are typically done in the industry;

h.  shall be responsible to perform day-to-day maintenance, clean-up, periodic sterilization and other operating procedures with respect to the Stadium concession facilities;

i.  shall hold regular meetings with the Rays, not less than monthly, for purposes of discussing any improvements or suggestions for improvements of the concession services which the Rays may have;

j.  shall keep all records reasonably necessary for the accounting for the concession services and the performance of its obligations;

k.  shall maintain copies of all records for a minimum of three years;

l.  shall pay the Rays an amount equal to the various agreed-upon percentages of gross receipts generated in connection with providing the concession services;

m.  shall provide the Rays a monthly commission report reflecting amounts accrued during each fiscal monthly accounting period within 20 days after the close of the period and shall pay the Rays the commissions accrued for that period;

n.  shall indemnify, defend and hold the Rays harmless from and against any liability incurred by the Rays as a result of the willful act, negligence or omission of Centerplate, its employees, agents, and contractors, and any other persons within its control;

o.  shall, upon the termination or expiration of the Agreement or as soon thereafter as is practicable, vacate all parts of the Stadium it occupies, and return the Stadium to the Rays, in the same condition as when originally made available to Centerplate, except for ordinary wear and tear and fire and other casualty loss;

p.  shall occupy and operate the Stadium concession services in strict compliance with all material laws, ordinances, regulations and underwriters requirements, including, without limitation, in strict compliance with the liquor control laws and regulations of the State of Florida; and

q.  shall maintain Public Liability, Property Damage Liability, Contractual Liability, Liquor, including Dram Shop, Liability, and Umbrella Liability Insurance coverages with a combined single limit coverage of not less than Ten Million Dollars ($10,000,000), workers' compensation insurance, Theft and Employee Dishonesty Insurance and such other coverages as are reasonably requested by the Rays and as are customarily maintained by

> concessionaires for premier sports facilities, all such insurance to be provided by insurance companies reasonably acceptable, shall not be canceled or changed in any material way except upon 30 days prior written notice to the Rays, and shall name the Rays as an additional insured, as its interests may appear.

(Ex. A, §§ 2-2.4, 2.6, 2.8-2.11, 3.2, 3.4, 3.7, 4-4.2, 4.4-4.5, 5.1-5.3, 6.2, 7.1-7.2, 8.2-8.3, 9, 10.1, 11.5, 12.2, 13.1.)

## Centerplate's Errors Require Immediate, Informal Resolutions and Agreements

26. Not long after the parties executed the Agreement, initial amendments, and subsequent change to the contract terms, the Rays began to uncover various errors in Centerplate's financial reporting.

27. As the Rays discovered more frequent issues of increasing severity, the Rays began demanding in-person meetings, open communication channels, and that Centerplate improve its performance and enhance fan experience.

28. As a result, the parties began to communicate more informally regarding the relationship and thereby modified their respective rights and obligations through emails, letters, phone calls, and in-person meetings.

29. Some of these changes were reduced to writing; others were not.

30. Through their contractual arrangements under the Agreement and various amendments, their intentional conduct, their long-standing relationship, and their extensive communications through the years—both oral and written—the parties agreed that Centerplate would correct its mistakes and continue to improve concessions.

31. Indeed, on April 9, 2009, Centerplate's former CEO, Des Hague, emailed Rays' executives, explaining: "I am encouraging a minimum of weekly client meetings to insure we are focusing on driving today's business together." (emphasis in original)

32.     Centerplate's CEO expressly encouraged the Rays to conduct in-person meetings with various Centerplate employees to interface and to address any inadequacies regarding Centerplate's performance under the Agreement.

**The Rays Discover Money Owed and Centerplate Balks at Redressing**

33.     The relationship continued to deteriorate when the Rays identified an error in Centerplate's sales reporting from the 2008 season.

34.     On April 14, 2009, when going over the team's reports for the past season, the Rays' Business Operations Coordinator broached the error with Centerplate's regional controller and inquired as to how it happened and how it would be remedied.

35.     Centerplate's regional controller candidly acknowledged that the employee responsible for the error was not trained properly by the previous controller.

36.     When asked if the error had been retrospectively reconciled, however, Centerplate's controller responded that it had not—even though the error involved an item that delivered one of the highest commissions to the Rays.

37.     Despite being confronted with the error, which Centerplate already knew about and now admitted, the controller indicated an unwillingness to correct it.

38.     In this review, the Rays also identified various inadequacies in Centerplate's ability to collect money from concessions.

**The Rays Enhance Monitoring of Performance Failures and Identify More Concerns**

39.     Beginning in June of 2009, because Centerplate demonstrated a reluctance to meet contractual expectations, forthrightly identify its violations of the parties' agreements, or remediate them when identified, the Rays began to develop a strategy to monitor Centerplate's performance.

40.     The Rays worked to identify additional inconsistencies and violations, demand increase accuracy in reporting, communicate frequently at various levels regarding performance, and establish customer service checkpoints and monitoring plans in an effort to force Centerplate to enhance fan experience and pay the Rays as required.

41.     Indeed, on June 23, 2009, the Rays voiced concerns in an in-person meeting with Des Hague regarding Centerplate's performance.

42.     The Rays then endeavored to review its contractual relationship with Centerplate, and learned of various areas where Centerplate acted unilaterally in interpreting the parties' agreement to the detriment of the Rays organization.

43.     To facilitate improved service and increased sales, the Rays attempted to create more incentives for Centerplate to deliver a higher quality experience for the fans, higher commission revenues for the Rays, and less staff time associated with reporting and enforcing the existing agreement.

44.     Meanwhile, however, Centerplate was improperly deducting production costs from various restaurant operations in an attempt to hide additional costs and reduce its reported annualized operating profits.

45.     Centerplate also failed to keep records of various financial metrics, while others began to change significantly each year and reveal additional inconsistencies.

46.     Payroll and food costs did not align with sales in certain restaurant spaces, items were categorized incorrectly or unaccounted for in sales reports, and payment structure changed many times over the years.

47.     Certain of Centerplate's errors were only revealed when the Rays received a bill from Major League Baseball relating to the items.  Only then did Centerplate remit payment.

48.     Even after the error surfaced, the Rays were forced to continue to pursue Centerplate for various commissions owed.  The Rays thus continued working to create more effective monitoring and accounting verification procedures and quality control filters.

49.     Still, Centerplate mislabeled concessions areas and stands in its financial statements, made unilateral decisions to its benefit, and secretly shifted the responsibility for the costs of cash register shortfalls to the Rays.

**The Rays Demand Compliance; Auditors Confirm Centerplate's Breaches**

50.     During the same time in which the Rays began documenting Centerplate's record-keeping and reporting failures, the Rays continually requested that Centerplate make enhancements to their services and then relayed a laundry list of performance issues to Centerplate in July of 2009.

51.     Due to Centerplate's furtive misconduct, the Rays hired a foodservice consultant in an effort to fully identify Centerplate's misdeeds.

52.     By August 24, 2009, the consultant found that Centerplate had engaged in the following:

    a.  delivered operations and financial statements revealing that Centerplate is including full time staff not dedicated to certain areas in the profit and loss ("P&L") statements for these facilities, thus artificially inflating staff costs and reducing the profits associated with these restaurants;

    b.  admitted that it needed to improve concessions, but had not executed;

    c.  provided confusing menus and access to restaurants and failed to maximize space for revenue, requiring changes to reduce staffing, food prep costs, re-brand;

    d.  created areas that are "not very successful," needed "added fan experience element[s]," and produced a "disappointment" in the taste of certain offerings;

    e.  selected sub-par subcontractors, resulting in the "condition and presentation of portables" that were "below industry standards," despite the fact that "[w]ith

minimal investment, the appearance and branding of portables could be significantly improved";

    f.    failed to devise and implement a strategy for "soliciting and evaluating subcontractor deals" that would result in "improving fan experience and driving sales";

    g.    failed to correct "significant problems with the appearance and professionalism" of subcontractors, such that "[c]ustomer service, employee appearance, and food presentation of subcontractors" are "a concern, and need[] more oversight from Centerplate";

    h.    failed not only to deliver sufficient vendors "to conform to industry standards," but failed with regard to existing ones as "[a]ll vendors need a significant improvement in uniform and overall appearance" and "[v]endors can be unnecessarily rude about tips";

    i.    failed to provide sufficient effective and regular training to civic groups and only trained group leaders, despite the fact that "[a]ll people who work at games need to have some training"; and

    j.    provided a "year-end 2008 statement [that] is not accurate," revealing that "Centerplate needs to work with the Rays on improving the financial reporting process," that the "Rays should audit Centerplate's financial statements," "closely monitor" Centerplate, and "point out reporting errors and penalize Centerplate."

53.    After the Rays' consultant delivered his report, the Rays Senior Vice President of Business Operations again met with Centerplate employees, reported various issues with Centerplate's performance, identified practices that were no longer going to be acceptable, discussed a need for better interaction going forward, and stated that subcontractors, vendors and other items needed improvement.

54.    Although the Rays raised these issues with Centerplate, the Rays soon identified other problems, including that Centerplate's depreciation expenses had increased fourfold.

55.    As the Rays brought these items to Centerplate's attention, by September 2009, the Rays discovered additional concerns.

56.     Centerplate admitted various breaches of the arrangement between the parties and fixed some irregularities after the Rays discovered them, including some underpayments, but additional understatements soon surfaced on monthly commission reports.

57.     By December 22, 2009, the Rays were forced to utilize its contractual right (Exhibit A, Section 7.2) to audit Centerplate's records by engaging the independent audit firm Grant Thornton as a result of Centerplate overcharging the Rays, improperly categorizing commissions, incorrectly excluding certain revenues from gross receipts, and improperly allocating overhead and other expenses.

58.     Grant Thornton preliminarily found overbilling, inaccurate allocations, underpayment, excluded sales that decreased the Rays' commission payments (even though the exclusions were "specifically disallowed" under the Agreement), and administrative payroll expenses incorrectly included in the calculation of income that resulted in further underpayment to the Rays.

59.     By January 11, 2010, Grant Thornton confirmed its preliminary findings and its work resulted in additional findings, including:

    a.   Centerplate had overbilled and overcharged;

    b.   Concessions had been included in incorrect categories, resulting in understated commissions;

    c.   Sales were excluded from gross receipts, reducing commissions owed to the Rays;

    d.   Despite the contract's requirements, Centerplate had been unable to determine inventory and related costs of sales directly attributable to certain operations, rendering accurate tracking of costs and the impact to Rays impossible;

    e.   Centerplate had instances of excess inventory and inventory shrinkage;

    f.   Invoices were not attributed as required and failed to properly allocate costs;

g. Centerplate underpaid commissions because it included expenses specifically disallowed by the agreement relating to corporate administrative staff; and

h. Salaries had been fully allocated to certain operations, but Centerplate did not track time spent "on-site" vs. on other projects, rendering it impossible to verify the accuracy of payroll costs.

60.     Based upon the audit's findings, the Rays demanded that Centerplate make the necessary changes to ensure that the contract would be enforced for the 2010 season.

61.     As a result of this performance audit, the Rays had multiple phone calls and discussions with Centerplate to address the identified breaches, including Centerplate's incorrect reporting of revenues and overstatements of management and administrative charges.

62.     Despite profiting handsomely off of the Rays, Centerplate failed to devote adequate attention to the Stadium, the Rays, and the concessions services it provided to Rays' fans.

**Centerplate Admits Inadequate Management, Overstated Expenses, Significant Sums Owed; Staffing Issues.**

63.     As the Rays voiced their concerns from the performance audit, Centerplate eventually relented, acknowledging by February 19, 2010, that Centerplate had discovered it owed hundreds of thousands of dollars to the Rays for longstanding accounting problems.

64.     Centerplate admitted this error and also attempted to address another Rays' concern by adding capacity and hiring a new manager for the Stadium's concession services.  The manager had authority to authorize capital expenditures, pricing changes, promotions, and other changes, but also still had other properties to manage and did not devote full time and attention to the Rays.

65.     In early March of 2010, Centerplate reported that the prior manager had engaged in *ultra vires* activity, and Centerplate attempted to renege on the prior manager's agreement to convert the commission paid on certain locations to prior, negotiated concessions' rates.  When

pressed, Centerplate conceded, however, that it would be willing to discuss this agreed-upon change.

66.     The Rays informed Centerplate of the findings of the Rays' foodservice consultant, which Centerplate acknowledged, and Centerplate further admitted owing over $200,000 for credits that were "incorrectly recorded" from 2007 to 2009.

67.     Centerplate also provided a narrative for improved performance of certain operations, including "better customer service" and training with the goal to "[i]ncrease sales" and "reduce waste and labor costs."

68.     Centerplate further proposed to change the current economic structure of multiple facilities to address ongoing issues.

69.     While Centerplate acknowledged its shortcomings, the Rays continued to address operating issues on ongoing basis and even assigned multiple Rays employees to coordinate customer service, assist Centerplate staff, and facilitate various improvements, including to cleanliness even though Centerplate bore responsibility for this issue.

70.     By April of 2010, Centerplate had begun to admit not only an understatement on various credits, but that Centerplate should provide "capital improvements for the facility" and other investment initiatives in the Stadium.

71.     Still, the Rays observed that Des Hague would not engage the Rays or properly handle the resolution of concerns raised.

72.     In May of 2010, Centerplate finally remitted payment owed for its 2008 admitted overstatement of management and administrative expenses and Centerplate's Senior Vice President, General Counsel, and Corporate Secretary noted the refund and that Centerplate would

pay for capital improvements and other capital needs at the Stadium and provide reimbursement for the costs associated with the audit pursuant to Section 7.2 of the Agreement.

73.     The Rays and Centerplate's Chief Financial Officer then executed a "Letter Agreement" ("Letter Agreement"), which in addition to addressing the violations revealed in the 2009 audit, altered additional sections of the Agreement.   A copy of the Letter Agreement is attached as Exhibit E.

74.     During 2010, Doug Clements was employed by Centerplate as a senior staff member at Tropicana Field. During Mr. Clements' brief time overseeing concessions operations at the Stadium, he demonstrated poor judgment related to alcohol while engaging with employees of the Rays front office after games.   On several occasions, often late at night, Mr. Clements phoned Rays' executive Melanie Lenz, speaking with Ms. Lenz both live and via voice mail messages, to report on the activities of the evening.   Mr. Clements' language during these calls often was incoherent, and no real business update message was ever conveyed.   Mr. Clements subsequently was removed from his position at Tropicana Field because of his inability to perform his job.

**Centerplate's Multiple Food Safety Failures, Stadium's Concessions Criticized by Media**

75.     Less than two months after the parties executed the Letter Agreement, ESPN aired a story on July 25, 2010, about apparent food safety and quality issues at the Stadium resulting from Centerplate's shortcuts.

76.     The ESPN food safety report indicated that every one of Centerplate's concession stands at the Stadium incurred a "critical violation" within the past year, according to state inspection reports.

77.     Within a week of ESPN airing its food safety report and publishing it online,[2] a Centerplate supervisor took two cups out of a spoilage container, washed them out, and added the dirty cups to a new cup stack.

78.     Not only did the media cover this incident, but Bob Pascal, Centerplate's Senior Vice President for Marketing, responded to a complaining volunteer who observed the incident that: "I investigated the situation with my colleagues and unfortunately as you described we had a situation in which our rigid policies and procedures were not followed.  We have taken the appropriate safety, disciplinary and training steps as a result of this incident."

79.     Thus, Centerplate admitted a food safety policy violation to a third party.

80.     The following day, on August 5, 2010, Des Hague emailed Rays executives, admitting that "the supervisor who caused this incident was not acting in compliance with our strict, standard operating procedures."

81.     Not only did Centerplate's CEO admit the violation and share his knowledge of the incident, he explained that "key executives will be present to ensure that the necessary standards are in place and being reinforced at the upcoming home stand."

82.     On August 6, 2010, Rays executives confronted Centerplate about the latest incidence of a breach of the Agreement involving sanitation issues.

83.     Despite its protestations, Centerplate continued its pattern of inadequate senior-level oversight and accountability.

84.     The Rays continued to press Centerplate regarding these issues.

---

[2]     Paula Lavigne, ESPN Outside the Lines, What's Lurking in Your Stadium Food?, http://www.espn.com/espn/eticket/story?page=100725/stadiumconcessions.

85.     Centerplate's mismanagement and mishandling of the concessions continued despite the Rays' best efforts to enforce the Agreement and demand compliance.

86.     Indeed, problems with Centerplate's operation of the restaurants and the accuracy of its reported revenue from the restaurants necessitated an additional Letter Agreement between the parties, amending the Agreement to reflect that the Rays would no longer be responsible for annualized operating losses of the restaurants and that Centerplate would instead pay the Rays based on gross receipts on a monthly basis within 20 business days after each month's end.

87.     A copy of this Letter Agreement, dated March 30, 2012, is attached as Exhibit F.

**Centerplate Again Violates Food Safety Requirements, Causing More Negative Publicity**

88.     In 2013, ABC News published a story detailing food safety violations in Centerplate's concession stands at the Stadium, according to state inspection reports.

89.     Over 46% of Centerplate's concession stands had five or more critical violations, which included improper hand-washing procedures and storing food at improper temperatures, practices associated with an increased risk of bacteria and salmonella.

90.     The Rays again confronted Centerplate about its food handling.

91.     Centerplate again pledged to improve its performance.

**Centerplate's CEO Causes Further Harm and Additional Backlash with Animal Abuse**

92.     Not only did Centerplate cause significant damage to the Rays' brand and reputation through its operation and management of the concessions and resulting media attention, Centerplate's chief executive created additional backlash and brought further harm to the Rays through his personal misconduct.

93.     A video surfaced in August of 2014 of Hague kicking a dog in a Vancouver elevator.

94.     Centerplate sent the Rays a letter entitled "Centerplate Response to Current Media Attention," acknowledging that "We are aware of the incident involving Centerplate CEO Des Hague and the attention surrounding it…."

95.     Centerplate's August 25, 2014 letter further explained that its corporate communications department prepared a statement "for release to the press and clients concerning our response," which read in part: "'Centerplate in no way condones the mistreatment of animals. We have been made aware of a personal matter involving Des Hague at a private residence in Vancouver and are conducting an inquiry into the situation.'"

96.     Centerplate endeavored to clarify, however, that "the unfortunate situation does not reflect the quality or level of service that our employees deliver to guests every day," further acknowledging the growing public damage to its clients from irate fans.

## Centerplate's Negligence Injures Fan; Centerplate Ignores Indemnity Obligation and Staffing Issues

97.     In September of 2014, the Rays were forced to again confront Centerplate with further damages Centerplate caused to the Rays.

98.     The Rays' outside counsel wrote to Centerplate after the Rays were named as a co-defendant in litigation due to Centerplate's negligence.   The Rays demanded indemnification pursuant to the Agreement and that Centerplate or its insurance carrier provide a defense.

99.     The Rays noted that, on June 9, 2014, the Rays' insurance carrier had already sent Centerplate correspondence requesting that Centerplate fulfill its duty to provide the Rays with a defense based on the unambiguous language in the Agreement.

100.     Centerplate refused to provide the Rays with a defense or to bear the cost of a defense, thereby failing to honor their indemnification obligations.

101.    In early 2015, the Rays again received notice of Centerplate's failures.

102.    A concerned citizen contacted the Rays to complain about a vendor who was a registered sex offender.

103.    The Rays alerted Centerplate that it needed to enhance its background check process, and Centerplate acknowledged its shortcomings and claimed that it took remedial actions.

104.    In 2016, the Rays were forced to follow up with Centerplate about the unanswered request for a defense in the 2014 lawsuit that "arose from injuries sustained when a sign, installed above the concessions area maintained by Centerplate, became dislodged and fell to the ground striking the Plaintiff … in the head."

105.    On numerous occasions throughout 2016 and 2017, the Rays demanded reimbursement after being forced to pay for their own defense, and they have incurred additional attorneys' fees and costs in an effort to collect these funds. In spite of Centerplate's indemnification obligations pursuant to the Agreement, Centerplate has refused to pay.

**Compliance Failures, Consultant Confirmation of Continued Defaults**

106.    Centerplate continued to breach the Agreement in 2017.

107.    In early 2017, the Rays learned that Centerplate had incorrectly advised employees of zoning laws and attempted to serve alcohol at the Stadium before the time allowed by local law.

108.    The Rays demanded compliance.

109.    In the summer of 2017, the Rays re-engaged their foodservice consultant to report on Centerplate's performance.

110.    The consultant noted breaches relating to use of the Rays' marks and Centerplate's history and continued pattern of billing issues, reporting errors, unusually high costs, profit-sharing failures, unusual commission statements, unaccounted for items, and mislabeled reports.

**Centerplate's Violations of its Record-keeping and Reporting Obligations**

111.    Under the Agreement and amendments, Centerplate received its exclusive grant as concessionaire on the condition that, among other things, Centerplate agreed to assist the Rays "in its monthly, quarterly and long-range business projections as to revenues and commissions under this Agreement."  Agreement, ¶ 2.10.

112.    Additionally, Centerplate agreed to "keep all records reasonably necessary for the accounting for the Concession Services and the performance of its obligations hereunder" and "maintain copies of all records for a minimum of three (3) years," which the Rays have the right to inspect after reasonable notice.  Agreement, ¶¶ 7.1, 7.2.

113.    Concession data maintained by Centerplate is critical to the Rays' immediate and long-range business projections and financial forecasts.  Accurate records and timely reporting would increase the Rays' profitability.

114.    Despite repeated demands, Centerplate has refused to provide the Rays with recent accounting records and concession data—a clear violation of its reporting obligations under the Agreement.

115.    Centerplate's continuous violations of its record-keeping and reporting obligations to the Rays have caused the Rays long-term damage through decreased profits.

**More Centerplate Food Safety Violations and Media Coverage Detrimental to Rays**

116.    Not long after the consultant reported areas of concern, in August of 2017 *Sports Illustrated* released a ranking of Major League Baseball stadiums based on food safety, also using state inspection reports.  The Stadium was ranked last, with 241 total violations, 105 of them labeled "critical."

117.    Violations included the presence of live insects, black mold, and improper hand-washing procedures.

118.    Again, the Rays communicated the unacceptability of Centerplate's material breaches and demanded compliance with the Agreement.

119.    These latest defaults continue Centerplate's sad history of failing to fulfill its obligations to provide "first class" concession services under the Agreement.

120.    Despite the Rays' efforts, Centerplate has consistently failed to comply with the parties' agreements and has tarnished the Rays' reputation.

**Centerplate's Extensive Damage to the Rays' Concession Facilities**

121.    As the Rays again attempt to mitigate the damages resulting from Centerplate's material breaches, it has engaged foodservice consultants and commercial cleaners to immediately remediate the facilities.

122.    Unfortunately, in cleaning up Centerplate's latest mess, the Rays have found countless new cleaning and maintenance issues, damaged equipment, and concealed neglect requiring extensive repairs, replacement, sterilization, and other out-of-pocket expenses.

123.    As an example, the Rays recently engaged draft beer technical experts from PRO BEV to evaluate its mechanical and sanitary needs using benchmarks set by the Brewers Association.

124.    Although an estimate is still forthcoming, the report found that the "Beer Dispensing systems at Tropicana Field fall well below the quality guidelines established by the [Brewers Association.] (emphasis in original)

125. The report noted that many additional deterioration issues were present "because of deferred maintenance or the absence of needed repairs and adjustments that were not addressed over time."

126. Additionally, the Rays have incurred substantial lost revenues each season as a direct result of the inadequacy of these beer dispensary systems.

127. Due to the deteriorated state of the concession facilities and numerous health and safety issues identified, Centerplate clearly failed to follow the maintenance, repair, and health and safety provisions in the Agreement.

128. The Rays are continuing the process of inventorying the numerous instances of damage that Centerplate has caused to the facilities, the Stadium, and the team.

**Centerplate Again Improperly Staffs the Stadium**

129. While the Rays continue to assess and mitigate the physical damage Centerplate caused to the Rays' property, the Rays recently learned of another instance of Centerplate improperly employing individuals to provide concessions services.

130. On November 28, 2017, the St. Petersburg Police Department informed the Rays that Centerplate had employed individuals from a halfway house for recovering addicts.  While a potentially noble pursuit, the Rays learned that some of the individuals may have been taken advantage of and forced to work for Centerplate.

131. The Rays have learned that the media may soon cover this latest instance of Centerplate misconduct, which would bring additional reputational harm to the Rays.

132. For years, the Rays attempted to resolve performance issues extra-judicially due to Centerplate's repeated representations that it would improve performance and conform to the parties' agreement.

133. The parties' Agreement will soon expire, and as the Rays undertake the process of preparing the concessions facilities for a new concessionaire, they continue to find extensive health and safety issues caused by improper and/or inadequate maintenance measures by Centerplate as well as significant damage to Stadium facilities caused by Centerplate. Notwithstanding the pending expiration of the Rays' agreement with Centerplate, the damage inflicted by Centerplate will continue for years to come.

134. All conditions precedent to the maintenance of this action have occurred, have been waived, or have been excused.

135. The Rays have retained the undersigned counsel and are obligated to pay a reasonable fee for their services.

## COUNT ONE: BREACH OF CONTRACT

136. The Rays incorporate and re-allege paragraphs 1 through 135 as though fully set forth herein.

137. The Concession Agreement and accompanying amendments, the parties' intentional conduct and course of performance, their long-standing relationship, and their extensive communications through the years—both oral and written—have created a valid agreement between the parties.

138. The Rays performed pursuant to the parties' agreement—rendering support and granting Centerplate the exclusive right and obligation to deliver concession services—thereby doing all, or substantially all, of the essential things that the Agreement required the Rays to do.

139. Centerplate materially breached essential terms of the parties' agreement by, among other things, failing to deliver the requisite quality of service and standard of performance required, failing to properly operate and maintain the concessions equipment and facilities, failing to keep

or provide accurate records to the Rays regarding revenues and commissions owed, and failing to indemnify the Rays for Centerplate's negligence.

140.    Centerplate's long history of material breaches have caused the Rays harm, including significant damage to its brand and reputation, lost profits, out-of-pocket costs, and additional sums due and owing as result of improper record-keeping, reporting, and .

141.    As a result of Centerplate's material breaches, the Rays have incurred, and continue to incur, damages.

WHEREFORE, the Rays respectfully request that the Court enter a judgment in favor of the Rays and against Centerplate for damages, costs, and interest and specifically enforce Centerplate's record-keeping and reporting obligations under the Agreement.

## COUNT TWO: BREACH OF IMPLIED-IN-FACT CONTRACT

142.    The Rays incorporate and re-allege paragraphs 1 through 135 as though fully set forth herein.

143.    The Rays and Centerplate entered into a valid contract through their conduct, relationship, and other circumstances, as well as through their written and spoken words.

144.    The Rays and Centerplate engaged in intentional conduct that each knew, or under the circumstances should have known, would be understood by the other party as creating a contract throughout the course of their relationship.

145.    Their assent to this contract can be derived from their course of dealing, usage of trade, and course of performance.

146.    Pursuant to the parties' agreement, the Rays agreed to provide Centerplate the sole and exclusive right to serve as concessionaire for the Stadium, and Centerplate agreed, among other things, to maintain the Stadium, conform to industry custom, provide quality concession

services, operate in first-class and sanitary manner, deliver a premier fan experience, and refrain from harming the Rays, its property, or its fans.

147.   Throughout the parties' relationship, and especially in the past five years, the Rays refrained from terminating the parties' relationship and initiating this action due to Centerplate's representations that it would improve performance and conform to the parties' agreement.

148.   Centerplate accepted the benefit of the Rays' inaction with reason to know that the Rays expected performance consistent with its high expectations for a premier sports facility and enhanced fan experience.

149.   Centerplate accepted this benefit and these terms with reasonable opportunity to reject them and took actions to affirm the parties' participation in this arrangement.

150.   Through their course of dealing, the Rays gave Centerplate reason to understand that Centerplate's assent to various contractual arrangements and obligations over the years could be manifested by inaction, silence, acceptance of the new conditions, or other affirmance.

151.   Centerplate reasonably understood that, as a result of the parties' past relationship and their previous dealings, it had a legal duty to speak if it did not accept these terms, and that its silence or other implicit affirmance would mean that it accepted the terms of the parties' relationship.

152.   Centerplate's responses to various issues raised by the Rays sufficiently manifested assent to the agreement even if Centerplate did not intend it as acceptance.

153.   Centerplate benefitted from the Rays' reliance on their agreement.

154.   The Rays performed pursuant to the parties' agreement, rendering support to Centerplate and providing Centerplate with the opportunity to provide concessions for the Stadium.

155.     Centerplate acted inconsistently with the Rays' expectation of a first-class concessionaire in a premier sports facility, such that Centerplate is bound in accordance with the offered terms.

156.     Centerplate materially breached the parties' agreement because it failed to deliver concession services as expected, in compliance with all applicable laws, ordinances, and regulations, and in accordance with the parties' agreed-upon high standards.

157.     The Rays have been harmed by Centerplate's failure to comply with the parties' agreement as Centerplate's material breaches and have caused the Rays damages.

WHEREFORE, the Rays respectfully request that the Court enter a judgment in favor of the Rays and against Centerplate for damages and interest.

## COUNT THREE: BREACH OF IMPLIED-IN-LAW CONTRACT

158.     The Rays incorporate and re-allege paragraphs 1 through 135 as though fully set forth herein.

159.     The Rays gave a benefit to Centerplate by granting Centerplate the right to provide concessions at all events held at the Stadium and receive revenue therefrom.

160.     Centerplate knew of the benefit that it received from the Rays.

161.     Centerplate appreciated, accepted, and retained the benefit that the Rays provided.

162.     Centerplate received this benefit, exercised day-to-day control over concessions, bore responsibility for concessions and related facilities and equipment, utilized the facilities and equipment to serve as concessionaire, and profited as a result, all while damaging the facilities, equipment, and the Rays in the process.

163.     The circumstances are such that Centerplate should, in all fairness, be required to pay the Rays for the benefit it received.

164.     Centerplate was unjustly enriched by knowingly receiving, accepting, and retaining the benefit of the opportunity that the Rays provided while failing to pay the Rays a fair share of revenue generated therefrom, diminishing the value of the Rays' reputation and brand, damaging its property, and causing significant lost profits.

165.     Under these circumstances, it is inequitable and unjust for Centerplate to retain the benefits provided by the Rays without compensating the Rays in return by paying for the harm caused.

WHEREFORE, the Rays requests that the Court enter a judgment in favor of the Rays and against Centerplate for damages and interest.

## COUNT FOUR: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

166.     The Rays incorporate and re-allege paragraphs 1 through 135 as though fully set forth herein.

167.     The Rays and Centerplate entered into an Agreement.

168.     The Rays did all of the significant things that the Agreement required the Rays to do by, among other things, supplying a venue and audience for Centerplate to deliver concessions, providing various support services, and profit-sharing.

169.     All of the conditions required for Centerplate's performance have occurred.

170.     Centerplate's actions and omissions unfairly interfered with the Rays receipt of the Agreement's benefits.

171.     Centerplate's conduct did not comport with the Rays' reasonable contractual expectations under multiple specific aspects of the Agreement, including, among other things, that:

    a.  Centerplate would keep the concession facilities free from damage and in good repair and working condition;

    b.  Centerplate would exercise due care with regard to the concession facilities;

  c. The Rays would be paid for any damages to the concession facilities;

  d. Centerplate would maintain all concession facilities in a first-class operating and sanitary condition;

  e. Centerplate would deliver concession services in a first-class manner through hygienic employees who comply with all applicable laws and regulations with respect to service;

  f. Centerplate would maintain all records of accounting for concession services;

  g. Centerplate would hold regular meetings with the Rays to discuss any suggestions or improvements of its concession services; and

  h. Centerplate would indemnify the Rays against liability incurred through Centerplate's negligence.

172. The Rays were harmed by Centerplate's conduct, which caused the Rays damages.

WHEREFORE, the Rays request that the Court enter a judgment in favor of the Rays and against Centerplate for damages and interest.

## COUNT FIVE: BAILMENT

173. The Rays incorporate and re-allege paragraphs 1 through 135 as though fully set forth herein.

174. The Rays delivered the Stadium, facilities, and equipment to Centerplate upon an express or implied contract that Centerplate would exercise due care with regard thereto, would keep the property free from damage and in good repair and working condition and, after the Agreement expired, would ensure the property was returned to the Rays in good repair and working condition as contemplated by the parties' agreement.

175. Centerplate accepted the bailment of the property, exercised control over it, was responsible for its use and repair, utilized it for its concessions services, and profited as a result, all while damaging the property in the process.

176.   Centerplate undertook the duty, was obliged to use due care, and would incur liability if negligent in relation to the property, including through its operation, maintenance, or repair of it.

177.   Centerplate took the Rays' property into Centerplate's care and custody, yet Centerplate failed to exercise the requisite degree of care toward it that a reasonably prudent person or business would bestow on his or its own property, especially in the concessions industry.

178.   Centerplate and the Rays contemplated compensation in return for the benefits flowing from the fact of the bailment.

179.   Centerplate returned the bailed property in a damaged condition, thereby failing to return the Rays' property in accordance with the terms of the bailment arrangement, and Centerplate's negligence caused damages to the Rays' property.

180.   The Rays suffered damages as a result of Centerplate's actions and omissions.

WHEREFORE, the Rays requests that the Court enter a judgment in favor of the Rays and against Centerplate for damages and interest.

## COUNT SIX: NEGLIGENCE

181.   The Rays incorporate and re-allege paragraphs 1 through 135 as though fully set forth herein.

182.   As a result of their past conduct, relationship, industry custom, and other circumstances, as well as their written and spoken words, Centerplate owed the Rays a duty to exercise due care with regard to the Rays' property, the Rays' fans, and the Rays' reputation and brand, including by, among other things, keeping the Stadium free from damage and in good repair and working condition, maintaining and repairing facilities and equipment when needed, completing various sterilization procedures, conforming to industry custom, providing quality concession services, operating in a first-class and sanitary manner, delivering a premier fan

experience, refraining from harming the Rays, its property, or its fans, and, upon the termination of the parties' relationship, ensuring that the Rays' property would be returned in good repair and working condition.

183.     Centerplate was negligent in providing concession services including through its actions and omissions in operating, storing, maintaining, and repairing the facilities and equipment, employing various individuals, and reporting and sharing revenue.

184.     Centerplate breached its duty and failed to exercise the requisite degree of care toward the Rays that a reasonably prudent person or business would exercise in the industry.

185.     Centerplate's negligent conduct caused the Rays damages.

186.     The Rays suffered actual damages as a result of Centerplate's acts and omissions, including, among other things, repair and other out-of-pocket costs, diminution in value to the facilities, reputational harm, lost profits, unpaid revenue, and other losses.

WHEREFORE, the Rays requests that the Court enter a judgment in favor of the Rays and against Centerplate for damages and interest.

<div style="margin-left:40%">

Respectfully submitted,

*/s/Bradford D. Kimbro*
Bradford D. Kimbro
Florida Bar No. 908002
brad.kimbro@hklaw.com
Joseph H. Varner III
Florida Bar No. 394904
joe.varner@hklaw.com
Anthony J. Palermo
Florida Bar No. 098716
anthony.palermo@hklaw.com
Holland & Knight LLP
100 North Tampa Street, Suite 4100
Tampa, FL 33602
Telephone: 813.227.6607
Fax: 813.229.0134

</div>

#54521617_v2